**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Eugene F. Koren, Robert E. Mjolsness, Richard G. Olson, John H. Stinson, and William R. Troehler, for and on behalf of themselves and other persons similarly situated,

Plaintiffs,

v.

SUPERVALU, Inc., and Preferred Products, Inc.,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 00-1479 ADM/AJB

---

Stephen J. Snyder, Esq., and Craig A. Brandt, Esq., Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN, appeared for and on behalf of Plaintiffs.

Barbara Jean D'Aquila, Esq., Cynthia A. Bremer, Esq., and Patrick R. Martin, Esq., Flynn, Gaskins & Bennett, L.L.P., Minneapolis, MN, appeared for and on behalf of Defendants.

---

## I. INTRODUCTION

This case was originally assigned to then Chief Judge Paul A. Magnuson and referred to Magistrate Judge Jonathan G. Lebedoff on June 16, 2000. On June 25, 2002, Senior Judge Magnuson issued an Order of Disqualification directing a reassignment of the case. On July 2, 2002, the case was reassigned to the undersigned United States District Judge and referred to Magistrate Judge Arthur J. Boylan. On November 27, 2002, the Motion for Summary Judgment [Docket No. 278-1] and the Motion for Decertification [Docket No. 278-2] of Defendants SUPERVALU, Inc. ("SV"), and Preferred Products, Inc. ("PPI") (collectively, "Defendants"), were argued before this Court. Named Plaintiffs Eugene F. Koren ("Koren"), Robert E.

FILED 3-14-03
RICHARD D. SLETTEN, CLERK
JUDGMENT ENT'D
DEPUTY CLERK

Mjolsness ("Mjolsness"), Richard G. Olson ("Olson"), John H. Stinson ("Stinson"), and William R. Troehler ("Troehler") (collectively, "Plaintiffs") have filed suit under the Age Discrimination in Employment Act ("ADEA"). James W. Payne III ("Payne") and Sharon Dennis ("Dennis") are opt-in Plaintiffs after conditional certification of a representative action. For the reasons set forth below, the Motion for Summary Judgment is denied in part and granted in part, and the Motion for Decertification is granted.

## II. BACKGROUND[1]

In 1998, SV restructured its private label business as part of a corporate-wide effort to make the company more competitive. Norvold Aff. Ex. 5. To that end, SV undertook to emulate a previous SV program called "ADVANTAGE," designed in 1994 as a key initiative to "achieve efficiency by eliminating duplication and reducing overall staff." Id. ADVANTAGE was to "dramatically alter almost every process and business system" within SV. Id. Koren, Mjolsness, Troehler and Dennis all worked for PPI, which "operated as a separate entity within SV and offered thousands of private label items." Id. In 1998, PPI's operations were discontinued as a stand-alone business. Certain of its functions were outsourced, and certain job functions were transferred to other departments at SV. Id.

SV's issued performance ratings to its employees on a four point scale from 0 (unacceptable) to 3 (consistently exceeds expectations). Id. Ex. 28. Each Plaintiff consistently received 2 (consistently meets expectations) ratings, while Olson received a 3 rating one year, and Stinson received five consecutive years of 3 ratings. Id. Ex. 29. Plaintiffs allege their

---

[1] This evidence is viewed in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

terminations were part of a pattern of age discrimination permeating SV, rather than determined by performance.

Leland Dake ("Dake") was a SV Vice President in 1998. SV held a Private Label show in Orlando in 1998, at which Plaintiffs allege Dake discussed the SV restructuring with two other vice presidents. The restructuring involved the creation of "new" positions within SV, with different job descriptions than previously existing positions, for which candidates (including employees) were required to interview. Plaintiffs allege that on January 29, 1998, at a 2:00 p.m. meeting about this process, Dake stated to Vice President and PPI General Manager Glenn Fischer ("Fischer") and Vice President Randy Wiegand ("Wiegand"): "This is how we stay legal, to eliminate the old people from the system and wipe the slate clean." Norvold Aff. Ex. 1. Fischer wrote down this statement on Orlando Airport Marriott stationery, and later typed a summary of the meeting including the comment. Id. Exs. 1, 2. Plaintiffs allege these notes reflect that Dake, while discussing the PPI transition, instructed Wiegand to create a list of primary functions to enable Human Resources ("HR") to "put together the new job descriptions." Id. Ex. 2. "[Dake] instructed [Wiegand] to make these significantly different functions in describing the new positions." Id. Plaintiffs argue this demonstrates Dake's intention to eliminate the elderly employees from the company during the PPI transition.

At the time of this transition, Dake was working with Lynn Olsen ("Olsen"), Corporate Director of Category Management for Cub Foods, on the project of "reviewing all of the existing Strategic Path and other [SV] information technology ("I/T") projects, current staffing, projected timelines and costs." Id. Ex. 3. At a transition meeting, Dake identified the objective of "rewrit[ing] job descriptions," including changing titles to "make sure jobs appear different," and

instructed others to "be careful." Id. Ex. 4. Dake told Wiegand and others to "be sure the losers cannot come back and cry foul," to "make sure new [job descriptions] are different," and to "consider potential legal action when writing duties – cannot appear similar to those that exist currently." Id. Wiegand's notes reflect that Dake stated: "If we are careful we will be able to pull this off just like they did under ADVANTAGE." Wiegand then noted Dake's ukase "let's do it right so we can get rid of the garbage and save some money." Troehler and another employee were identified by name as "need[ing] to go." Id. (emphasis in original). Finally, the meeting notes state that Dake "will be part of the interview process so the two of us can neutralize personnel." Id.

The "targeted group" in the early stages of the ADVANTAGE program was identified as employees "age 50+ with 70+ age/service combination." Id. Ex. 9. "Pros" and "cons" were listed by SV in assessing the use of involuntary terminations rather than severance exit incentives for the program. A "pro" was the "precise targeting of those we want to leave," while "cons" were that the program was "almost sure to provoke [an] age discrimination suit," and would cause "damage to company image." Id.

Numerous documents produced by SV relating to the ADVANTAGE program list employees with their ages identified. Id. Exs. 13-17. Documents dated January, 1997, list older SV employees and employees with an age-plus-service combination of 70, 75 and 80 years for the Home Office and PPI departments. Id. Exs. 18-21. Several specific ages of employees are highlighted throughout these documents. As part of the ADVANTAGE program, Plaintiffs assert job descriptions were changed, and existing employees were required to interview for the "new jobs." Wiegand Dep. at 88. Employee Profile forms reporting the birthdate of each

employee were sent to supervisors in connection with performance and salary reviews, promotions and other employment actions. Wiemer Dep. at 26-27; Smith Dep. at 83-84, 101-03; Nawrot Dep. at 55-57; Wiegand Dep. at 97; Stinson Dep. at 182. Employee Profiles were assembled on all PPI employees prior to the interviews for the new jobs in Store Brands, the new department. Wiegand Dep. at 98-99. Employee Information Sheets including birthdates were placed in personnel files available to supervising managers. Norvold Aff. Exs. 47-51; Smith Dep. 83-84. SV utilized centralized recordkeeping human resource forms for its Home Office employees, including both I/T and PPI. Norvold Aff. Exs. 38-55. Brad Willems ("Willems"), former PPI Controller and later SV Internal Auditor, described the status of PPI, a wholly owned subsidiary, such that "PPI employees were [SV] employees." Willem Dep. at 33-34.

Wiegand, at his deposition, stated the company desired the "prerogative" of denying the applicants as unqualified. Id. Wiegand testified that Dake had repeatedly explained that "the beautiful thing about the ADVANTAGE program was that you could eliminate the garbage . . . by eliminating the existing jobs, creating new positions and making sure that existing employees would not qualify for the new positions, thus they could be eliminated and it was all completely legal." Id. at 44. Wiegand testified that Dake made it clear to "anybody that wanted to listen" that this system allowed management to "eliminate the older, higher priced employees, replacing them with younger employees with obviously a lesser income." Id. Wiegand explained that the "garbage" Dake referred to was the "older employees." Id. at 44-45. Wiegand recounts that Dake "gleefully" made it known that he regarded this "systematic[] and legal[]" process of "getting rid of the employees you didn't want" as the "greatest thing since sliced bread." Id. at 129. Plaintiffs allege that the terminations in the I/T and PPI departments in 1998 were a

continuing part of a pre-existing discriminatory mentality at SV, evidenced by the policies utilized in connection with the ADVANTAGE program.

Plaintiffs assert that Dake was carrying out a pattern of discrimination directed by Jeffrey Noddle ("Noddle"), then Executive Vice President and President of the Wholesale Food Companies (and current Chairman and Chief Executive Officer of SV), and Pamela Knous ("Knous"), Executive VP and Chief Financial Officer. Knous' responsibilities included the I/T department. Norvold Aff. Ex. 65. Dake was involved in directing the restructuring of PPI. Plaintiffs allege Dake was also a decisionmaker for the I/T terminations because he worked (at Noddle's suggestion) with Knous reviewing I/T projects and current staffing. Norvold Aff. Exs. 3, 34; Knous Dep. at 75-76. Defendants dispute that Dake had any decisionmaking role regarding the I/T department terminations. I/T VPs Ross Eichelberger ("Eichelberger") and Richard Nawrot ("Nawrot") were later involved in the I/T termination decisions. Nawrot was hired as an I/T VP on November 3, 1997, to address Noddle's concerns about having the "right managerial talent" in the department. Smith Dep. at 54-55, 57. Dake's calendar shows he was present at meetings for I/T issues on November 7, 19 and 24, 1997. Norvold Aff. Ex. 67. For the PPI selections, Wiegand and Willems were decisionmakers along with Dake. Norvold Aff. Ex. 37; Willems Dep. at 5. On December 17, 1997, an "extremely confidential" meeting regarding the transition of PPI was attended by Dake, Fischer, Willems, and others. Norvold Aff. Ex. 68 (emphasis in original). At the meeting, current employee lists for PPI were printed and entries for Fischer, Wiegand and David Wiemer were hand-stricken, with handwritten entries indicating the birthdates of three other employees. Norvold Aff. Exs. 68-70; Gallagher Dep. at 373-74. A target date for completing the PPI plan was set for February 21, 1998. Norvold Aff.

Ex. 68.

On December 18, 1997, Dake met with Wiegand and indicated to him the "deck was going to be stacked" and that specific employees, including Troehler, Mjolsness, Tom Riley and others, were not going to be retained in the new organization. Wiegand Dep. at 479-81. Dake also told Wiegand that Koren, who was working in another department, was "going" as well. Id. at 481. On December 23, 1997, Dake and Olsen, met with Knous to discuss their assignment to the Strategic Path project within I/T. Norvold Aff. Ex. 71. Dake and Olsen were directed to examine "the current I/T infrastructure and all of the projects currently on board to see how they fit the needs of [SV] as a whole." Id. Ex. 34. The end result was to be "one consolidated [SV] I/T plan." Id. During the process, Dake was to "wear his overall [SV] hat." Id. Dake's involvement with the I/T group included at least five meetings with Eichelberger, Knous and other I/T managers during January, 1998. Norvold Aff. Ex. 74. Dake testified that he put "close to a full time effort" on the I/T Strategic Path project during January, while maintaining his responsibilities for PPI. Dake Dep. at 252. Eichelberger, Nawrot and Houghton S. (Skip) Smith, III ("Smith"), Corporate Senior Vice-President of Information Technology, conducted a "Succession Planning Process" for all I/T staff to compare candidates "by their performance and potential for growth." Norvold Aff. Exs. 82-83; Smith Dep. at 121-23. Smith also met with Knous as a part of this process. Norvold Aff. Ex. 84. A document listing ten I/T managers, all of whom were later terminated, included the ages of seven of them, including Plaintiffs Olson, Payne and Stinson. Id. Ex. 86; Derendal Dep. at 269-72; Nawrot Dep. at 335. Whether or not the potential performance rankings were utilized in selecting the I/T managers and directors who would be terminated, asked to retire, or demoted, is in dispute.

Dake, primarily involved on the PPI side, distributed a memo on January 7, 1998, regarding future steps for PPI, indicating the need to "step up efforts" to reorganize. Id. Ex. 72. The memo set a progress meeting for the week of January 12, the Private Label Show in Orlando for the week of January 26, and suggested presenting a final PPI reorganization plan to Noddle the week of February 23, 1998. Id. The implementation was to be completed by the end of the First Accounting Quarter of 1998. A PPI organization chart dated January 12, 1998, contains handwritten designations of "out" for several PPI employees, including Koren, Mjolsness, Troehler and Dennis. Id. Ex. 73. Next to other employees names is an "ok" designation, and, for some, question marks were written. Id.

Wiegand's notes from the Orlando show in late January 1998, indicate the goal of specifying eight to ten new primary functions for each job "to allow [SV] to eliminate certain people." Norvold Aff. Ex. 75. Wiegand noted Dake's instruction was to look for "significantly different job functions so current staff can be displaced and replaced." Id. The notes also log that Fischer was "upset" and that he "[went] at it with [Dake] over getting pushed aside because of his age." Id. Fischer stated that he wanted a "contract or letter before he lifts a finger." Id. After Fischer left this meeting, Wiegand asserts that Dake made a phone call, then returned and stated to Wiegand amidst "profanity-laced venting:" "I'm going to get that white-haired son of a bitch." Wiegand Dep. at 245-46, 249.

To support their claims, Plaintiffs rely on the statistical analyses of statistician Dr. Kinley Larntz ("Dr. Larntz") using the HR data produced by SV. Plaintiffs argue Dr. Larntz's analysis demonstrates a strong statistical correlation between age and the involuntary terminations and demotions of PPI and I/T employees occurring in 1998, as well as a strong statistical correlation

between age and the "potential" ratings given to Home Office candidates from every department. Expert Report of Kinley Larntz, Ph.D., 5/8/02. For the broad group of I/T employees, Dr. Larntz's conclusion was one of no statistical significance between the last performance ranking and age, but a highly statistically significant correlation between the managerial potential rankings and age, with the older employees being more likely to receive lower potential rankings. Larntz Report at 114-22. Dr. Larntz found the same correlation for existing managers. Id. at 104-08. In both categories, Dr. Larntz concluded that there was approximately a one in 10,000 chance that the statistical differences identified could arise by chance alone. Id. at 108, 117.

Nawrot testified that SV's Candidate Profile forms, which include the birthdate or age of the candidate, were used in assessing potential to identify "promotable people." Nawrot Dep. at 192; Norvold Aff. Exs. 88-109. Candidates where ranked on their promotion potential. Norvold Aff. Ex. 110. Dr. Larntz analyzed the Candidate Profile forms, and found that age was a highly statistically significant factor in predicting the "potential" ranking given to each employee, even though the actual performance rankings for those candidates were similar across age groups. Larntz Report at 138-46. Dr. Larntz also identified the differences in potential rankings as significant such that less than one in 10,000 of these differences could have occurred by chance alone. Id. at 140.

On February 1, 1998, Dake wrote to Wiegand and Willems reminding them to create the "[p]rimary job functions of the new positions," and put "[n]ames to the appropriate boxes tentatively." Norvold Aff. Ex. 37; Dake Dep. at 148-57. He also instructed them to highlight names with the "best long term potential." Norvold Aff. Ex. 37. Wiegand prepared this chart on February 2, 1998. Id. Ex. 113; Wiegand Dep. at 33-34, 48, 53. Plaintiffs characterize this chart

as representing "pre-selections" of the candidates to be hired. Dr. Larntz analyzed the various revisions of the chart and found that age was a strong factor in the pre-selection decisions, and that the pre-selections were a statistically significant factor in predicting those who were ultimately terminated or demoted from PPI. Larntz Report at 16-23.

On February 6, 1998, HR Director John Berquam ("Berquam") directed that all copies of the PPI charts be retrieved and destroyed, stating that such a chart "would have lawsuit written all over it." Wiegand Dep. at 56-59; Norfold Aff. Ex. 120. Wiegand was told by Willems that the "chart had fallen in the wrong hands and that it could be very detrimental to the company if it was allowed to continue to circulate." Wiegand Dep. at 58. Fischer, however, kept his copy of the chart and highlighted an existing PPI organization chart to compare it with the "pre-selections" as they correlated to older PPI employees. Norvold Aff. Ex. 121. Fischer was then terminated on February 11, 1998. Fischer Dep. 546-48; Norvold Aff. Ex. 122.

Dake's calendar shows meetings with Berquam and others on the PPI side, and Nawrot, Knous, Eichelberger and Noddle on the I/T side during February, 1998. Norvold Aff. Exs. 74, 131. Dake told Wiegand more than once that he wanted a "younger, leaner, more professional-looking organization." Wiegand Dep. at 40. Dake described to Wiegand and Willems that the ideal employee was a "young, lean, well-groomed male." Id. at 91. Former Store Brands Category Manager Judy Welter confirms that Wiegand relayed to her that Dake wanted employee teams of "white, male and young" employees. Welter Aff. ¶8. Plaintiffs allege similar comments were made by Dake to Fischer during PPI task force meetings in 1997. Fischer Dep. at 222-25. Fischer testified Dake described multiple times his preference was for "young, slender, athletic, well-groomed, not white hair young men" to work for him. Id. at 222. Fischer

also describes that Dake identified Troehler by name as an example of what "this process" would get rid of. Id.

On the morning of initial PPI interviews in April 1998, Dake instructed Wiegand privately three or four times to vote for certain individuals, giving him "specific directions as to how [Wiegand was] supposed to score people . . . during the interview process." Wiegand Dep. at 94-96, 461-62, 483-84. Wiegand, uncomfortable about his role and the legality of the PPI selections, confronted Dake about the process being a "facade" and "if [not] illegal, [then] immoral." Wiegand Dep. at 102, 228-29. Wiegand testified Dake reminded him "that it not only was taking place at PPI but it was taking place throughout the company." Id. at 103. Shortly before May 15, 1998, Wiegand told Noddle he wanted to leave the company, and "specifically told Mr. Noddle that members of PPI were being systematically eliminated because of their age and their compensation level." Id. at 120-21, 285-87. On May 15, 1998, Wiegand was terminated by Dake. Id. at 108-09; Norvold Aff. Ex. 171.[2]

Ultimately, Koren's position of PPI Packaging Manager was eliminated, and Koren was terminated effective June 5, 1998, at age 55, after applying for but not being selected for a restructured position. Norvold Aff. Ex. 5; Koren Dep. at 334-35. Mjolsness and Troehler also interviewed for positions, but were denied. Norvold Aff. Exs. 155, 180-81. Mjolsness, a PPI Buyer, and Troehler, PPI Product Manager, were terminated on July 17, 1998, at ages 57 and 51,

---

[2] On June 25, 1998, Wiegand sent a detailed letter to HR Director Michael Gallagher at SV explaining his views on how the ADVANTAGE program was being used by Dake and SV to hire or promote young employees and discriminate against older workers. Norvold Aff. Ex. 184 at 2. Wiegand later entered into a settlement agreement with SV requiring that he and his wife keep his June 25, 1998, "Informal Assertion" of claims "forever confidential." Id. Ex. 196 at 2, 4.

respectively. Norvold Aff. Exs. 26, 27; Mjolsness Dep. at 470; Troehler Dep. at 24-26, 517. Dennis, the PPI Accounting Supervisor, was terminated effective September 12, 1998, at age 42, after being rejected for the restructured Accounting Supervisor position. Dennis Dep. at 120-21.

The three Plaintiffs employed in the I/T department all concluded their employment with SV in 1998. Olson, Manager of Corporate Production Support in I/T, was terminated effective April 11, 1998, at age 53. Id.; Olson Dep. at 445. Stinson, Director of Electronic Communication, was terminated effective August 15, 1998, at age 51, and Payne, General Director Regional Information Services for I/T, was asked to retire on March 26, 1998 and did so effective April 6, 1998, at age 61. Id.; Smith Dep. at 348-49; Stinson Dep. at 289-90.

Dr. Larntz's conclusion after statistical analysis of the results of both the I/T and PPI restructurings was that age was a strong factor in involuntary terminations or demotions of the employees, with older employees more likely to be affected. Larntz Report at 3-10, 50-72.

Stinson notarized his EEOC charge of discrimination on January 26, 1999, and filed it with the EEOC on January 28, 1999. Norvold Aff. Ex. 167; Techar Second Aff. Ex. GG (FOIA0217). Olson and Koren signed their charges on January 28 and 29, 1999, respectively. Id. Exs. 198, 199. Stinson, Olson and Koren's charges were cross-filed with the MDHR within six days. Id. Exs. 200-02. Mjolsness filed his charge of discrimination with the MDHR on May 21, 1999, and Koren and Mjolsness amended their charges in February, 2000. Id. Exs. 203-05. All charges included classwide charges of a pattern or practice of discriminatory conduct by SV. Id. Exs. 167, 198, 203-05. On June 15, 2000, Koren, Olson, Stinson, Troehler and Mjolsness notified the MDHR of their intent to bring a private civil action. Id. Ex. 210. This action was filed on June 16, 2000. Id. Ex. 211. Dennis and Payne filed their opt-in consent forms on

October 26, 2001.

## III. DISCUSSION

### A. Statute of Limitations

#### 1. Constructive Discharge, Continuing Violations and 29 U.S.C. § 626(d)

The parties dispute whether or not Payne's ADEA charge is timely filed. Payne is an opt-in plaintiff seeking to piggyback on Stinson's initial filing with the Equal Employment Opportunity Commission ("EEOC"). Opt-in plaintiffs such as Payne are limited to those persons who "could have filed a timely charge on the same date as the named plaintiff." Church v. Consolidated Freightways, Inc., 137 F.R.D. 294, 309 (N.D. Cal. 1991). The claim accrues on the date that "the adverse employment action is communicated to the plaintiff." Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1328 (8th Cir. 1995). On March 26, 1998, Payne was informed that his position was being eliminated, and on that date he understood that he would have "no future opportunity to come to work" after May 2, 1998. Payne Dep. at 214-15, 242-43, 343, 422, 448. On March 26, 1998, Payne was 60 years old, and felt like he was "being treated with a gun to [his] head" because SV was insisting that on May 2, 1998, he was "going to retire." Id. at 242-43. At this time Payne contacted his personal lawyer because he felt "buffaloed" and that "[a]ge was a factor." Id.

Payne argues that Dring is inapplicable because Dring was told he was being "laid off," while Payne was instead told his position was being eliminated and was asked to retire. Payne argues because he was not expected to decide whether or not to retire until April 3, 1998, and did not in fact decide until April 6, 1998, his claim did not accrue until April 6. This distinction is immaterial because Payne's testimony establishes that he was aware as of March 26, 1998, that

his employment would end on May 2. Payne stated: "When I was informed my job was eliminated, . . . I interpreted those statements that my job was eliminated, having something to do with forced retirement, forced acceptance of retirement, and no future opportunity to come to work." Payne Dep. at 214-15. Payne further stated: "I felt I was being treated with a gun to my head by [SV] saying you will no longer work here after the 1st of May and these are the terms that we're going to give you, but you're going to retire." Id. at 243. Payne did not believe there was any possibility of future employment, but rather that SV had reached a "definitive conclusion" to terminate Payne's employment by eliminating his position without offering any other job. See Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1419 (3d Cir. 1991). Accordingly, Payne's claim accrued on March 26, 1998.

Payne next argues he was constructively discharged and therefore his claim was timely filed. Most courts have found that an offer of early retirement constitutes a constructive discharge when the choice is "essentially either early retirement or continuing to work under intolerable conditions, like the threat of termination without benefits." Smith v. World Ins. Co., 38 F.3d 1456, 1461 (8th Cir. 1994). A constructive discharge exists where an employee is faced with two choices, either of which make him or her "worse off." Id. (citing James v. Sears, Roebuck & Co., 21 F.3d 989, 993 (10th Cir. 1994)). In the constructive discharge context, Payne argues the charge-filing period does not begin to run for an employee facing an uncertain employment future and possible termination if he does not resign until the employee relents and confirms resignation. Flaherty v. Metromail Corp., 235 F.3d 133, 138 (2d Cir. 2000) ("This is essentially the converse of the discriminatory discharge case where the date the employer gives notice of termination to the employee is controlling for purposes of accrual. In the case of

constructive discharge, it is only the employee who can know when the atmosphere has been made so intolerable by the discrimination-motivated employer that the employee must leave."). Here, Payne did not initiate his own departure in response to intolerable working conditions. SV admits that Payne had no option to continue employment after May 2, 1998. Defs.' Reply Mem. at 4. Payne's situation presents a fact pattern of employment termination rather than a constructive discharge because, even though the option of retirement was left open for him to consider and accept, it was made clear to Payne on March 26, 1998, that continued employment was decidedly not an option.

Payne also argues that he was not considered due to age discrimination for the subsequent job posting in SV's I/T department of "General Director Production Operations" in May 1998. Pls.' Mem. in Opp'n at 41. Payne argues the statute of limitations on this claim does not begin until June, 1998, when SV announced that a younger employee was selected for this position. See Kult v. Deluxe Corp., No. 00-CV-2525, 2002 US Dist. LEXIS 7863, at *1 (D. Minn. Apr. 26, 2002) (denying summary judgment on ADEA claim where within one year of a reduction-in-force employer created new position substantially similar to plaintiff's and hired a person 15 years younger). Relatedly, Payne argues that Thiessen v. G.E. Capital Corp., 267 F.3d 1095, 1109-11 (10th Cir.), allows him to piggyback on Stinson's timely claim because he is similarly situated and adversely affected by the same policy on which a continuing violation is alleged. "[W]hen a plaintiff challenges an *ongoing pattern or practice of discrimination* rather than one isolated instance, the alleged violation may be deemed continuing . . . if the plaintiff establishes that any violation took place during the statutory period." Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1303 (8th Cir. 1997) (emphasis in original). Payne asserts that the continuing

violation doctrine allows charges under the alleged pattern or practice constituting the violation continuing at least through June 1998.

The continuing violations theory permits courts to consider alleged discriminatory acts occurring prior to the statutory limitations period where plaintiff challenges an ongoing and continuing pattern or practice of discrimination. Jenson v. Eveleth Taconite Co., 824 F. Supp. 847, 877 (D. Minn. 1993). The acts complained of must not be completed, distinct occurrences, and must be related to violative acts occurring within the statutory period. Laffey v. Independent Sch. Dist. No. 625, 806 F. Supp. 1390, 1400 (D. Minn. 1992). A continuing violation must be either a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system or policy during the limitations period and before. Mandy v. Minnesota Mining and Mfg., 940 F. Supp. 1463, 1468 (D. Minn. 1996).

Discrete employment actions such as termination, failure to promote, denial of transfer, or, in Payne's case, refusal to hire, are not sufficient to constitute a continuing violation. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 2073 (2002) (holding that claims deriving from discrete acts must be filed within the applicable statute of limitations time period or are untimely); High v. University of Minn., 236 F.3d 909 (8th Cir. 2000) (holding the continuing violations doctrine has never been applied to a discrete act); Bradley v. American Home Prods. Corp., Case No. 00-CV-4, 2002 U.S. Dist. LEXIS 19736, at *9-11 (D. Minn. August 16, 2002) (finding late ADEA, Title VII and MHRA claims for a discrete act are time-barred and not saved as a continuing violation).

Payne's reliance on Kult is misplaced. Kult's department had been eliminated in a reduction-in-force ("RIF"). Kult established that he applied for nine positions and failed to

receive an interview for any of them. Id. In addition, Kult presented evidence that hiring managers viewed him as a "dinosaur," and that the employer re-created a job position strikingly similar to his eliminated job position within approximately a year of the RIF. Id. at *9-10. Payne's scenario is dissimilar.

SV maintains that a prior Order of Judge Lebedoff limits timely claims to 300 days before the first charge, and that Hukkanen v. Int'l Union of Oper. Engrs., Hoisting & Portable Local No. 101, 3 F.3d 281 (8th Cir. 1993), belies Payne's argument. "When Title VII[3] violations are continuing in nature, the limitations period . . . does not begin to run until the last occurrence of discrimination." Id. at 285. However, Hukkanen alleged and proved a pattern of sexual harassment that culminated in her constructive discharge. Such is not the case with Payne. "The continuing violation doctrine is premised on 'the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated.'" Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1221 (11th Cir. 2001) (citing Alldread v. City of Grenada, 988 F.2d 1425, 1432 (5th Cir. 1993)). "[T]he purpose of permitting a plaintiff to maintain a cause of action on the continuing violation theory is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred." Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 446 (7th Cir. 1994). Payne's testimony establishes that he believed age played a role in SV's determination to eliminate his position on March 26, 1998. "A claim arising out of an injury

---

[3] Courts look to Title VII cases as well as the ADEA for statute of limitations purposes. Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1221 n.10 (11th Cir. 2001) ("The purposes underlying ADEA and Title VII, specifically their respective requirements that employees file charges of discrimination with the EEOC so that the employer can attempt to resolve the issue through conciliation, are similar.").

which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the . . . limitation period." Hipp, 252 F.3d at 1221 (citation omitted). Such is the case with Payne.

The Fifth Circuit has provided a structured approach to the continuing violation analysis which applies a non-exclusive three-pronged test: (1) whether or not the acts involve the same subject matter, (2) the frequency of the acts, and (3) the degree of permanence of the alleged acts of discrimination. Berry v. Board of Supervisors of L.S.U., 715 F.2d 971, 981 (5th Cir. 1983); Bradley, 2002 U.S. Dist. LEXIS 19736, at *13. The third factor relates to whether or not "an act outside the limitations period should have triggered the plaintiff's awareness of and duty to assert his or her legal rights." Mandy, 940 F. Supp. at 1470. Here, the third factor, permanence, is dispositive, because Payne admits that the events of March 26, 1998, instigated his concern that "age was a factor," and he learned that he was barred from working at SV after May 2, 1998. Accordingly, the continuing violations doctrine is inapplicable to Payne.

Ultimately, the accrual of an employment discrimination claim "commences when a plaintiff knows, or has reason to know, of the discriminatory act." Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 37 (1st Cir. 2001). Payne's testimony and actions evidence that his belief he was subject to a discriminatory action was formed on March 26, 1998. Timely claims are limited to claims accruing no more than 300 days prior to the first filed charge. 29 U.S.C. § 626(d); see also January 19, 2001 Order at 3-4 [Docket No. 53]. The first charge was filed with the EEOC by Stinson on January 28, 1999. Techar Second Aff. Ex. GG (FOIA0217). Payne's representative claim was more than 300 days later and is therefore untimely; it is not saved by the constructive discharge or continuing violations theories.

**2. Payne, Dennis, Mjolsness & Troehler Individual ADEA Claims**

Payne, Dennis, Mjolsness and Troehler did not file individual ADEA claims but rely on Anderson v. Unisys Corp., 47 F.3d 302 (8th Cir. 1995), to maintain individual claims under the so-called "single filing" rule. Defendants assert that their claims are time-barred under 29 U.S.C. §§ 626(b)-(e), which require charge filing within 300 days and subsequent suit filing within 90 days. 29 U.S.C. §§ 626(d)-(e). This argument relies on Defendants' averment that the prior filing of an EEOC charge is a strict prerequisite to bringing suit individually. There is a split in Circuit authority on this issue. Compare Whalen v. W.R. Grace & Co., 56 F.3d 504, 505-507 (3d Cir. 1995) (stating that the single-filing rule has not been applied to non-class action ADEA suits in the Third Circuit, viewing opt-in suits under § 16(b) as akin to permissive joinders, and rejecting in that context "piggybacking" by amending the complaint to add named plaintiffs who have not filed timely EEOC charges) with Howlett v. Holiday Inns, Inc., 49 F.3d 189, 194 (6th Cir. 1995), cert. denied, 516 U.S. 943 (1995) (citing Tolliver v. Xerox Corp., 918 F.2d 1052, 1057 (2d Cir. 1990)) ("[T]he 'single filing rule' is not limited to class actions but also can permit a plaintiff to join individual ADEA actions if the named plaintiff filed a timely administrative charge sufficient to permit 'piggybacking' by the joining plaintiff.").

The Eighth Circuit has not confronted the issue directly, however in dicta has contemplated the status of plaintiffs who have never filed an administrative charge but seek to "piggyback" on the filed claim of another and "deem[ed] it reasonable to permit them to join suit as long as the claimant on whose administrative filing they have relied timely files suit . . . ." Anderson, 47 F.3d at 308-309. The court distinguished between piggybacking plaintiffs who have and have not filed separate administrative charges, noting that "[t]hose plaintiffs who do

file administrative charges [are] bound by the statute of limitations . . . normally stated in the right-to-sue letter." Id. at 309. Here, none of these Plaintiffs ever filed EEOC charges individually. SV's Motion for Summary Judgment on the individual ADEA claims of Dennis, Mjolsness, Payne and Troehler is denied.

**3. MHRA Claims**

**a. Payne and Dennis**

Opt-in Plaintiffs Payne and Dennis cannot maintain MHRA claims because the MHRA has no opt-in procedure. The parties agree that summary judgment is proper as to any MHRA claims relating to Payne and Dennis. See Pls.' Mem. in Opp'n at 44 n.377.

**b. Koren, Mjolsness and Troehler Claim Viability**

An MHRA claim must be filed within one year of the alleged discrimination. Minn. Stat. § 363.06 Subd. 3. (2003). Koren filed his claim with the EEOC on January 29, 1999, alleging discriminatory conduct occurring on April 6, 1998. Norvold Aff. Ex. 199 (P012775). The record establishes that Koren cross-filed with the MDHR on February 2, 1999, well within the one year time limitation. Id. Ex. 201 (FOIA1373).[4] Accordingly, Koren's MHRA claim is both viable and timely.

Mjolsness filed a charge with the MDHR on May 21, 1999. Id. Ex. 203 (D016068). His charge alleged discriminatory termination on June 8, 1998, to be effective July 17, 1998, at age 57. Id. Defendants assert that Mjolsness had formed a belief prior to June 8, 1998, that the process of determining which PPI employees would continue to work for Store Brands was

---

[4] Koren submitted an amended MDHR and EEOC charge form on February 10, 2000. Norvold Aff. Ex. 204.

discriminatory, and therefore, his claim is untimely. Defs.' Reply Mem. at 6. However, the Court can discern no evidence of record supporting this assertion. Mjolsness' claim is viable and timely.

Defendants assert Troehler's claim is invalid because the MHRA does not permit piggybacking with any parallel opt-in procedures to those present in the ADEA. Defendants argue the law of this case was established by Judge Lebedoff's Order that "[t]here is no mechanism under the MHRA to opt-in to an existing lawsuit or file a consent to sue form." January 19, 2001 Order at 5 (holding that Fischer's claims were time-barred for failure to file a timely MHRA claim and that adding him as a plaintiff would be futile). Troehler joined the suit as a named Plaintiff in June 2000, more than a year after his allegedly discriminatory 1998 event, but never filed a charge with the MDHR. Plaintiffs argue that Troehler can piggyback on the charges of Koren, Mjolsness, Olson and Stinson.

The "single filing rule" has been "uniformly" applied the rule in Title VII and ADEA cases. Howlett, 49 F.3d at 194. As stated above, the single filing rule "can permit a plaintiff to join individual ADEA actions if the named plaintiff filed a timely administrative charge sufficient to permit 'piggybacking' by the joining plaintiff." Id. (internal citation omitted). Plaintiffs assert this rule applies to Troehler in the MHRA context. McAdams v. United Parcel Serv., Inc., 30 F.3d 1027, 1029 n.3 (8th Cir. 1994) ("Because of the paucity of published caselaw on the MHRA, we look to precedent arising from similar federal laws . . . [as] sanctioned by Minnesota's courts.").

The Eighth Circuit has held that piggybacking in the ADEA context is allowed only where "administrative claim[s] give notice that the discrimination is 'class-wide,' *i.e.*, that it

alleges discrimination against a class of which the subsequent plaintiff is a member." Kloos v. Carter-Day Co., 799 F.3d 397, 400-01 (8th Cir. 1986). Minnesota state courts have discussed the single filing rule principles of the Eighth Circuit in addressing opt-in plaintiffs in MHRA cases. Anderson v. Northwestern Nat'l Life Ins., 480 N.W.2d 363, 366 (Minn. Ct. App. 1992) (finding Kloos instructive on the purposes of the filing rules, but declining to apply the single filing rule to allow piggybacking). Plaintiffs argue that the Anderson court implicitly accepts that piggybacking is allowed in MHRA cases, but that "some limit to what claims an opt-in party can raise when relying on the administrative filing of another" exists. The plaintiff in Anderson failed to fall within the established limitations Anderson held to support opt-in plaintiffs under the MHRA, namely that the class representative must (1) belong to the same class as those represented, (2) possess the same interest and suffer the same injury, and (3) have claims of similar scope to those represented.

Plaintiff argues that Koren, Mjolsness, Olson and Stinson all filed timely MHRA claims alleging class-wide discrimination, that Koren and Mjolsness identified Troehler by name, and that Troehler is similarly situated. Plaintiffs assert that Defendants were timely on notice that class-wide claims were being made against them, in satisfaction of the purpose of the administrative filing requirement. Id. at 365 (citing Kloos, 799 F.2d at 400). In deciding not to apply the single filing rule in Anderson, the Minnesota Court of Appeals found that the purpose of the filing requirement outweighed the plaintiff's ability to opt-in where the filed charge specified the scope of the class claim. Id. at 366.

Plaintiffs' argument presents a tenuous connection between the acceptance of piggybacking in the Title VII and ADEA contexts and its application in the MHRA context.

Plaintiffs admit that the MHRA has no statutory opt-in procedure comparable to § 216(b) of the Fair Labor Standards Act. Pls.' Mem. in Opp'n at 44 n.377. The reference to piggybacking standards by the Minnesota Court of Appeals in Anderson is not sufficient for this Court to infer that Minnesota courts intend for the piggybacking rule to apply across the board to MHRA claims.[5] Accordingly, Troehler's claim is untimely and must be dismissed.

### c. Koren, Olson and Stinson Timeliness

45 days after filing a charge, and where the commissioner has not dismissed the charge or issued a "no probable cause" determination, a party is to notify the commissioner of an intention to bring a civil action. Minn. Stat. § 363.14 Subd. 1(1)-(3). The action is then to be commenced within 90 days of such notice. Id. Subd. 1(3). On June 15, 2000, Mjolsness, Koren, Olson, Stinson and Troehler gave notice to the MDHR of their intent to bring a civil action (which was filed on June 16, 2000). The MDHR did not issue a right to sue letter to any of the plaintiffs. Defendants argue that the EEOC right to sue letters issued April 20, 2000, triggered Plaintiffs' 45-day window within which to bring suit. Plaintiffs respond that the § 363.14 Subd. 1(1) requirement only applies to dismissal by the MDHR, not the EEOC. The "commissioner" referenced in § 363.14 Subd 1(1) is defined as the "commissioner of human rights." Minn. Stat. § 363.01 Subd. 8. The EEOC right to sue letter is not covered by Minnesota statute and does not start the 45-day window.

As discussed above, Koren's MHRA claim is timely. Defendants argue that Koren, Olson and Stinson's MHRA claims rest on inadmissible evidence. Defs.' Reply Mem. at 7.

---

[5] Further, whether or not Troehler, a PPI employee, could establish he was similarly situated to Olson and Stinson in the I/T department is doubtful.

Defendants challenge the June 15, 2000 letter to the MDHR communicating the intent of Mjolsness, Koren, Olson, Stinson and Troehler to bring a civil action. Norvold Aff. Ex. 210. Defendants' only support for this challenge is a blanket reference to their "Motion to Strike." Defs.' Reply Mem. at 7; see Docket No. 302. In his Order of October 23, 2002 [Docket No. 318], Judge Boylan ruled that the pending motions to strike were "efforts to address traditional summary judgment issues outside the page limits imposed for summary judgment in this case." October 23, 2002 Order at 5. Judge Boylan suggested that the parties address the motion to strike issues in their summary judgment briefs. Id. Defendants have not done so, and therefore their objections are considered waived. The determination of the admissibility of Norvold Aff. Ex. 210 will be addressed at trial.

**4. Section 181.81**

Plaintiffs withdraw all their claims under Minn. Stat. § 181.81. Pls.' Mem. in Opp'n at 46 n.385. Accordingly, all § 181.81 claims are dismissed.

**5. Remaining Claims**

After applying the relevant procedural bars, the remaining claims are: the ADEA representative action for all Plaintiffs except Payne, ADEA individual actions for all Plaintiffs, and the MHRA claims of Koren, Mjolsness, Olson and Stinson.

**B. Summary Judgment Motions**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). Further, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted).

**1. Age Discrimination Standard**

The ADEA prohibits an employer from discriminating on the basis of a person's age, if such an individual is over 40 years old. See 29 U.S.C. § 631(a); Dammen v. Unimed Med. Ctr., 236 F.3d 978, 980 (8th Cir. 2001). The ADEA states in part that "[i]t shall be an unlawful employment practice for an employer [to] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). To establish a claim under the ADEA, a plaintiff must show that the defendant intentionally discriminated against him. Ziegler v. Beverly Enterprises-Minn., Inc., 133 F.3d 671, 675 (8th Cir. 1998).

The parties agree the appropriate standard for assessing the age discrimination

representative action claims is the "pattern or practice" model. International Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977) ("[B]ecause it alleged a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, the Government ultimately had to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It had to establish by a preponderance of the evidence that . . . discrimination was the company's standard operating procedure--the regular rather than the unusual practice."); Glass v. IDS Fin. Servs., Inc., 778 F. Supp. 1029, 1058 (D. Minn. 1991) ("The Eighth Circuit has also expressly rejected the McDonnell Douglas analysis in the context of federal discrimination class actions."). Under this test Plaintiffs must establish "by a preponderance of the evidence that the defendant engaged in a pattern or practice of unlawful discrimination in various company policies, that 'discrimination was the company's standard operating procedure--the regular rather than the unusual practice.'" Id. (internal citation omitted). In disavowing use of the McDonnell Douglas test at the liability stage of class actions, the Eighth Circuit noted that "[i]n a complex class action, utilizing statistical proof and counterproof, the value of the Burdine sequence--to highlight the issues in contest--is about as relevant as a minuet is to a thermonuclear battle." Craik v. Minnesota State Univ. Bd., 731 F.2d 465, 470 n.7 (8th Cir. 1984). The Court concluded:

> Therefore, in considering the merits of the class claims, we shall focus on whether the plaintiffs proved that the defendants engaged in a pattern or practice of discrimination, thereby establishing a prima facie case with regard to the claims of individual class members, without attempting to fit the evidence into the McDonnell Douglas-Burdine framework.

Id. Plaintiffs need not prove a formal written policy, however, but an "informal or unstructured method of decision-making may be sufficient." Glass, 778 F. Supp. at 1052. The burden of

showing a pattern or practice may be met by "producing direct or circumstantial evidence that [an] employer effectuated a pattern of discriminatory age-based decisionmaking." Flavel v. Svedala Indus., 868 F. Supp. 1422, 1460 (E.D. Wis. 1994). Plaintiffs are "not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed." International Bhd. of Teamsters, 431 U.S. at 260. At that point, "[t]he burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [Plaintiffs'] proof is either inaccurate or insignificant." Id. Accordingly, the initial focus here is to evaluate the evidence of pattern or practice. The evidence of pattern or practice is taken together with evidence pertaining to individual claims, reciprocally, for this purpose. Craik, 731 F.2d at 471 (holding that for "both the individual and class claims, all the evidence was relevant and should have been considered together").

Plaintiffs allege a scheme, deriving from the original ADVANTAGE program, that was incorporated into the PPI and I/T restructuring in 1998, wherein the methodology of changing job titles and disingenuously interviewing to fill the "new" positions was utilized to eliminate older employees. This, Plaintiffs assert, is a pattern or practice sufficiently supported by the evidence to avoid summary judgment.

A recitation of Plaintiffs' allegations appears above in Section II, and need not be reiterated here. Several statements allegedly made by Dake could reasonably be considered by a jury to be evidence of age discrimination. Although Defendants dispute many of Plaintiffs' allegations, including the statistical analyses of Dr. Larntz, and Dake's role of a decisionmaker in the I/T department's hiring decisions, such factual disputes will not be decided here. Plaintiffs

have demonstrated sufficient evidence, supported by the record, suggesting a pattern or practice of discriminatory conduct by SV to avoid summary judgment on their representative action, as well as individual claims.

Defendants have not shown that Plaintiffs' evidence is irrelevant or insignificant. Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' ADEA and MHRA claims is denied.

**C. Decertification**

The fundamental inquiry for an ADEA representative action[6] is whether or not the plaintiffs are "similarly situated" under the Fair Labor Standards Act. 29 U.S.C. § 216(b) (applicable to ADEA actions pursuant to 29 U.S.C. § 626(b)). Hoffman-LaRoche Inc. v. Sperling, 493 U.S. 165, 169 (1989), authorizes the sending of notices to potential plaintiffs in a representative action suit. A "colorable basis" for the claim that a class is similarly situated must be shown prior to sending Sperling notices. Severtson v. Phillips Beverage Co., 137 F.R.D. 264, 267 (D. Minn. 1991). This requirement is, however, a "fairly lenient" test, requiring no more than "substantial allegations," which typically results in a "conditional certification" of the representative class. Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1214, 1214 n.8 (5th Cir. 1995). Here, a class was conditionally certified and Plaintiffs have sent Sperling notices to at least 325 current and former SV employees inviting them to join this suit. Two individuals elected to become opt-in Plaintiffs: Payne and Dennis.

The second stage is now germane, and Defendants' Motion to Decertify is analyzed under

[6] An ADEA class action differs from a traditional Rule 23 class action in that putative class members are required to "opt-in," rather than being required to "opt-out." Lusardi v. Xerox Corp., 118 F.R.D. 351, 359 n.18 (D.N.J. 1987) ("Lusardi I").

a stricter post-discovery standard. At this stage,

> the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives--i.e. the original plaintiffs--proceed to trial on their individual claims.

Id. The criteria by which the "similarly situated" status of a representative class is determined includes age variance, year and type of termination, divisions and offices within the company in which plaintiffs worked, employment status, supervisors and salaries. Ulvin v. Northwestern Nat. Life Ins. Co., 141 F.R.D. 130, 131 (D. Minn. 1991). Opt-in plaintiffs performing "different jobs at different geographic locations," who are "subject to different job actions," where "various decisions by different supervisors [are made] on a decentralized employee-by-employee basis" are not appropriate for class treatment. Id. (citing Lusardi v. Xerox Corp., 122 F.R.D. 463, 465 (D.N.J. 1988) ("Lusardi II")). Decertification is appropriate if there are "disparate factual and employment settings of the individual plaintiffs." Lusardi I, 118 F.R.D. at 159.

Here, the factual and employment settings of the Plaintiffs requires decertification. The Plaintiffs worked at different jobs in different business units located at different locations. The I/T Plaintiffs were management and worked on information technology systems throughout SV. The PPI Plaintiffs worked at various jobs from buyer to accounting to product manager to packaging. Plaintiffs' salaries varied from $35,000 to $136,000, while their ages ranged from 42 to 60. The IT and PPI decisionmaking processes differed, and the hiring decisions for former PPI employees appear decentralized, involving multiple decisionmakers. The instant Plaintiffs are not similar to the plaintiffs in Glass, who presented significant evidence that they held "identical

positions," "the same job requirements," and were subject to uniform national performance standards, and a similar compensation system. Id. at 1080-81. Moreover, Plaintiffs' proffered statistical data is not appropriately considered in relation to decertification, because statistical evidence does "not address the similarly situated requirement." Lusardi I, 118 F.R.D. at 376 n.41.

Plaintiffs' evidence of Dake's personal involvement and statements provide the required linkage between PPI and I/T employees to raise a significant issue of fact sufficient to defeat summary judgment. However, in attempting to overcome the significant differences between the I/T and PPI employees outlined above, Plaintiffs have not shown that Dake was an I/T decisionmaker with a meaningful role in the I/T restructuring with sufficient certainty to support a ruling that the named and opt-in Plaintiffs are "similarly situated" for purpose of § 216(b). Defendants' Motion for Decertification is granted.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Docket No. 278-1] is **GRANTED** on the basis of untimeliness for Payne's representative ADEA claim and Troehler's MHRA claim, and **DENIED** as to all other Plaintiffs and claims, and

2. Defendants' Motion for Decertification [Docket No. 278-2] is **GRANTED.**

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: March 14, 2003